# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# SPARTANBURG DIVISION

| | |
|---|---|
| Ingles Markets, Incorporated, and Sky King, Inc., ) | Civil Action No. 7:14-4828-MGL |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | **FINDINGS OF FACT** |
| ) | **AND** |
| Maria, LLC, ) | **CONCLUSIONS OF LAW** |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiffs Ingles Markets, Incorporated, and Sky King, Inc., (collectively, "Plaintiffs"), brought this civil action for specific performance and declaratory and injunctive relief against Defendant Maria, LLC, ("Defendant"), seeking to prevent Defendant from proceeding with construction on property adjacent to property leased by Ingles and owned by Sky King. (ECF No. 1). Defendant answered and plead its own claim for declaratory relief, as well as counterclaims of tortious interference with contract, unfair trade practices, and abuse of process.[1] (ECF No. 22).

After discovery was completed, Defendant filed a Motion for Partial Summary Judgment, (ECF No. 55), and Plaintiffs filed a Motion for Summary Judgment. (ECF No. 56). After briefing and oral argument, the Court issued an Order, (ECF No. 80), granting in part and denying in part Plaintiffs' Motion for Summary Judgment and denying Defendant's Motion for Partial Summary Judgment. The Court granted that portion of Plaintiffs' Motion for Summary Judgment that sought dismissal of Defendant's counterclaims for tortious interference, unfair trade practices, and abuse of process, leaving the question of whether or not an injunction should

---

[1] Additionally, both Plaintiffs and Defendant brought competing claims of trespass, which were subsequently dismissed *with prejudice* by stipulation of the parties. (ECF No. 76).

issue as the central issue left for decision. An action to enforce restrictive covenants by an injunction sounds in equity. *South Carolina Dept. of Natural Resources v. Town of McClellanville*, 345 S.C. 617, 550 S.E.2d 299 (2001). Accordingly, the decision as to whether an injunction should issue is for this Court alone.

In its prior Order, the Court found that a material issue of fact existed as to whether the Exhibit E proffered by Plaintiffs was, in fact, the Exhibit E referenced in the Declaration of Reciprocal Easements, ("REA"), that was agreed to by shopping center developer and declarant of the REA, Jaylin Spartanburg South, LLC, ("Jaylin"), and intended to be filed along with the rest of the REA. (ECF No. 80). As such, on August 17, 2016, the matter came again before the Court for a bench trial focusing on this set of issues. (ECF No. 85). Counsel for Plaintiffs and Defendant were present and participated. Plaintiffs' arguments were based on the testimony of Ephraim Spielman, Esq., Plaintiff Ingles' legal counsel and Assistant Secretary, as well as documents admitted into evidence during the trial. Defendant's arguments were based upon counsel's cross-examination of Spielman, documents admitted into evidence during the trial, and evidence already before the Court, including all exhibits and other materials submitted in connection with the parties' cross motions for summary judgment previously ruled on by the Court. At the behest of Defendant, the bench trial resumed for an additional day of testimony on September 27, 2016, (ECF No. 91), during which time Defendant offered the testimony of witnesses William Sims, a real estate broker who represented Jaylin in the sale to Bill and Miriam Akkary, ("the Akkarys"), of the property that is the subject of this litigation, and Steven Querin, an attorney who represented the Akkarys in their purchase of the property. The record is now closed.

Having reviewed the entire record in this case, including the materials submitted in connection with the parties' cross motions for summary judgment, and the additional live testimony and exhibits introduced in connection with the bench trial of August 17, 2016 and September 27, 2016, the Court sets forth the following Findings of Fact and Conclusions of Law, which resolve this matter in its entirety.

## **FACTUAL FINDINGS OF THE COURT**

Plaintiff Ingles is the anchor tenant of a commercial retail space, or "shopping center," located near the intersection of U.S. Highway 176 and Springfield Road in Spartanburg, South Carolina. Originally owned by developer Jaylin, the shopping center is now owned by Plaintiff Sky King. The Akkarys, who are the controlling owners of Defendant Maria, have operated two businesses within the same shopping center since approximately 2001, when they first entered into leases with then-owner Jaylin.

Pursuant to the terms of the lease agreement for the Ingles store, as between Sky King, successor in interest to Jaylin, and Ingles, all owners and tenants in the shopping center are subject to certain use and development restrictions. (ECF Nos. 1-1 and 1-2). For example, owners and tenants may not erect additional buildings in the shopping center that do not appear on the site plan, which is attached to the amended lease agreement. (ECF No. 1-2). Those same restrictions are contained in the Declaration of Reciprocal Easements, or "REA," (ECF No. 1-3), which was filed with the Spartanburg County Register of Deeds on June 10, 2002.

On or about January 7, 2011, the Akkarys entered into a contract with Jaylin for the purchase of 0.91-acres, or "subject property." On the site plan and as described in the REA, the subject property appears as two separately designated outparcels. (ECF No. 1-3 at p. 3).

3

The REA is included in the subject property's chain of title. The REA imposes certain restrictions on the future development of the shopping center. Although the REA refers to and incorporates by reference an "Exhibit E" in four separate places, this exhibit was not attached to the recorded instrument. The key provision of the REA that is at issue in this litigation, directly references Exhibit E and reads as follows:

> **5.3 Restrictions Relating to Development.**
>
> Development and use restrictions shall limit the construction to be performed on Parcels 1, 2, and 3 to the construction of one building of one story and no more than twenty-four (24) feet in height in the locations and with the requisite parking spaces, shown on Exhibit "E" attached hereto. (ECF No. 1-3 at p. 7).

Other references to Exhibit E appear in the sections of the REA which define the two outparcels that comprise the subject property. These parcels are referred to in the REA and its attached exhibits as "Parcel 2" and "Parcel 3," respectively. (ECF No. 1-3 at pp. 13-14). The REA sets forth each parcel separately by metes and bounds.

The contract governing the sale of the subject property required seller Jaylin to provide to the Akkarys copies of the following documents pertaining to the property: existing surveys, title insurance policies, condemnation information, environmental reports, copies of leases and amendments, and any other information pertaining to the ownership or operation of the property which the buyer reasonably requests. Although Jaylin produced a copy of the REA, along with other documents related to the subject property, Jaylin never produced Exhibit E or any other document setting out additional restrictions or limitations on use and development.

Neither the Akkarys nor their representative recall making any specific inquiry regarding the missing Exhibit E. There is no evidence in the record that they asked Mr. William Sims, the broker involved in the sale of the property, to provide a copy. Nor is there any record evidence

4

that they asked a direct representative of Jaylin, such as Mr. Charles Chudakoff, for a copy. Nor did they contact any representative of Ingles (whose consent was required under Section 6.9 of the REA for amendment to the REA) for information concerning the missing Exhibit E.

After owning the subject property for several years, the Akkarys, now operating through Defendant Maria, closed on a construction loan and entered into an agreement with a construction company for development of the subject property. The contemplated new construction would consist of a single building of approximately 8,800 square feet, resting across the .91 acres purchased from Jaylin and spanning portions of both "Parcel 2" and "Parcel 3," as designated in the REA.

Plaintiffs learned about the contemplated construction in or about November 2014, when Ingles was contacted by a representative of Maria regarding the removal of certain light poles in the parking lot of the shopping center. As a result of this contact, Ingles' counsel provided Maria's counsel with notice of Ingles' rights with respect to construction on the outparcels and a copy of the missing Exhibit E. Shortly thereafter, Plaintiffs filed this action, alleging that Defendant's proposed structure violated the restrictions contained in the REA, including both the language of the above cited Article 5.3, which limits "construction to be performed on Parcels 1, 2, and 3 to the construction of one building of one story," as well as the additional building size and configuration limitations set out in Exhibit E.

Based on the testimony, exhibits and argument presented during the August 17, 2016, hearing, the Court finds as follows in regards to the legal status of the proffered Exhibit E.

1. Plaintiffs relied primarily on the testimony of Ephraim Spielman, Esq., an Atlanta-based attorney specializing in commercial real estate. Spielman has represented

5

Ingles since 1985. He was the primary attorney representing Ingles in connection with negotiations with Jaylin regarding the shopping center. (ECF No. 94 at pp. 4-7).

2. Spielman and his office drafted the original lease between Ingles and Jaylin, which was dated December 15, 1999. This lease contained a site plan, noted as Exhibit A to the lease, which was prepared by Siteworks, Jaylin's engineers, but which was approved by Ingles. (ECF No. 94 at pp. 9, 13, 29).

3. Examples of protections that Ingles required to be included in the lease appear in paragraphs 2.7 and 6.1. These sections indicate that Ingles must provide prior written consent to any substantial alterations to the shopping center layout and design, as set forth in the site plan.

4. Subsequent to the execution of the original lease, Jaylin approached Ingles and requested that it approve a revised site plan, which included construction on Parcels 2 and 3. Jaylin presented Ingles with several different site plan proposals, including the eventual new site plan, which Ingles approved and which was attached to the amended lease agreement. Ingles approved the shapes, sizes, and locations of the specific structures permitted on Parcels 2 and 3 because they would only minimally obstruct the view of the Ingles store from adjoining roads. (ECF No. 94 at pp. 27-28).

5. This new site plan is the genesis of the proffered Exhibit E of the REA, insofar as it is a blow-up of the portion of the new site plan showing Parcels 2 and 3. It was prepared by Jaylin's engineers, and the impetus for preparing it (and for amending the lease to include it) came not from Ingles but from Jaylin. (ECF No. 94 at p. 39).

6. Based upon Spielman's testimony and the other record evidence, the Court concludes that, although not attached to the REA, the proffered Exhibit E, which was prepared

>by Jaylin largely for the benefit of Jaylin, was in fact agreed to by Jaylin and was intended to be included as an exhibit to the REA.

Based on the testimony, exhibits and argument presented during the September 27, 2016, hearing, the Court finds as follows in regards to the testimony of William Sims and Steven Querin.

William Sims is a real estate broker who represented Jaylin and its managing member, Charles Chudakoff, in the sale of the subject property. (ECF No. 95 at pp. 12-13). Sims testified that, as a broker, he would expect to receive from the developer anything in the developer's file relating to the property, including surveys, easements, covenants, and restrictions. (ECF No. 95 at p. 13). He acknowledged that the subject property consisted of two separate lots or tracts that were comprised of .91 acres total, *id.* at pp. 16 and 43-44, and that based on his conversations with Chudakoff, he believed that Jaylin was a "highly motivated" seller. *Id.* at pp. 28-29.

Sims testified that among the documents that he received from Jaylin were: a plat identifying the two lots as separate parcels, (the so-called "Northpoint Plat"), and a copy of the REA. *Id.* at pp. 43-44. Specifically, as to Exhibit E, Sims: (1) confirmed that it was not attached to the REA: (2) acknowledged that he had no recollection of ever specifically asking Chudakoff to furnish him a copy; and (3) admitted that Exhibit E would be an important, even "critical," document to someone concerned with what could be built on the subject property. *Id.* at pp. 48-50.

Steven Querin is a South Carolina attorney whose practice focuses upon commercial real estate and who represented the Akkarys in the purchase of the subject property. *Id.* at 58-59. As to the REA, Querin acknowledged its importance as a document in the transaction and testified that he obtained and reviewed a copy before closing. *Id.* at pp. 62-63 and 87. Like Mr. Sims, he

testified that he does not recall making any specific inquiry regarding the missing Exhibit E, *id.* at pp. 89-92, even though he acknowledged that under the terms of the REA any changes with regard to Parcels 1, 2 and 3 had to be in strict compliance with the REA and in conformance with Exhibit E. *Id.* at 88-89.

## DISCUSSION AND CONCLUSIONS OF LAW

Plaintiffs maintain that the contemplated construction will result in irreparable harm to their property interests, primarily because the proposed building will permanently obstruct the visibility of the Ingles store (or any future replacement tenant) from the adjacent roadways, resulting in loss of customer goodwill and, ultimately, business revenue. Defendant counters that its proposed construction is not in violation of any restriction contained in the REA of which it had notice or of which it is chargeable with having notice.

In order to prevail on an action for a permanent injunction, a plaintiff must demonstrate: (1) it has suffered irreparable injury; (2) there is no adequate remedy at law to compensate for that injury; (3) considering the balance of equities between the parties, the remedy of injunction is warranted; and (4) the public interest would not be disserved by a permanent injunction. *True Fishing, Inc. v. Redwing Tackle, Ltd.*, 888 F.Supp.2d 726, 737 (D.S.C. 2012)(citing *eBay, Inc. v. MercExchange*, LLC, 547 U.S. 388 (2006)). In analyzing these factors, "inadequacy of damages and irreparability of harm are often treated interchangeably." *Palmetto Conservation Foundation v. Smith*, 642 F.Supp.2d 518, 531 (D.S.C. 2009). The standard for a permanent injunction is essentially the same as for a preliminary injunction, with the exception that the plaintiff must show success on the merits. *Smith v. South Carolina State Election Com'n*, 901 F.Supp.2d 639 (D.S.C. 2012). After reviewing the evidence, as well as the written and live

8

presentations of the parties, and after balancing the equities, the Court concludes that Plaintiffs are entitled to a permanent injunction.

      A.      **<u>PLAINTIFFS ARE ENTITLED TO HAVE THE RESTRICTIVE COVENANTS ENFORCED.</u>**

Plaintiffs are entitled to have the restrictive covenants set out in the REA enforced. Under South Carolina law, "[a]s voluntary contracts, restrictive covenants [should] be enforced unless they are indefinite or contravene public policy." *Seabrook Island Property Owners Ass'n v. Marshland Trust, Inc.*, 358 S.C. 655, 661, 596 S.E.2d 380, 383 (2004) (quoting *Houck v. Rivers*, 316 S.C. 414, 416, 450 S.E.2d 106, 108 (Ct. App. 1994)). Here, the provisions of the REA are neither indefinite nor in violation of public policy.

The REA was filed with the Spartanburg County Register of Deeds in 2002. Therefore, well prior to their purchasing the property, the Akkarys were on actual notice that they could not construct one building spanning Parcels 2 and 3, as they wish to do. The REA provides as follows:

> **5.3     Restrictions Relating to Development.** Development and use restrictions shall limit the construction to be performed on Parcels 1, 2, and 3 to the construction of one building of one story and no more than twenty-four (24) feet in height in the locations and with the requisite parking spaces, shown on "Exhibit E" attached hereto.

The REA expressly limits any construction on Parcels 1, 2, or 3 to one building per parcel. Maria argues that this restriction contemplates the existence of one building spanning more than one parcel. However, such an argument is inapposite. Such a construction would make development of Parcel 1, which is not contiguous with Parcels 2 and 3, impossible. Moreover, reference to Exhibit E confirms that the REA limits development of Parcels 2 and 3 to one building per parcel, as it sets forth the specific locations of each potential building on Parcels 2

and 3.[2]  Although Exhibit E was inadvertently not attached to the REA, the Court finds that Maria had constructive notice of Exhibit E and its contents.

"Constructive notice is a legal inference which substitutes for actual notice." *Crop Production Services v. SCBT, N.A.*, 2014 WL 1796345 at *6 (D.S.C. 2014) (internal citation omitted).  "It is notice imputed to a person whose knowledge of facts is sufficient to put him on inquiry; if these facts were pursued with due diligence, they would lead to other undisclosed facts." *Id*.  In the context of a real estate transaction, constructive or inquiry notice arises when a party becomes aware or should have become aware of certain facts, which, if investigated, would reveal the claim of another.  A party will be charged by operation of law with all knowledge that an investigation by a reasonably cautious and prudent purchaser would have revealed.  *Spence v. Spence*, 368 S.C. 106, 120, 628 S.E.2d 869, 876 (2006).  Here, the REA was a matter of public record, correctly indexed.  It specified restrictions as to construction on Parcels 1, 2, and 3 and referenced a specific "Exhibit E," as setting forth further details concerning where structures were required to be located.  These details included the location, orientation and square footage of permitted structures.  Although missing from the recorded REA, a prudent purchaser would have made some further inquiry regarding Exhibit E.  *See South Carolina Tax Commission v. Belk*, 266 S.C. 539, 544, 225 S.E.2d 177, 180 (1976) ("[a] purchaser cannot carelessly disregard record notice of potential encumbrances, even when the adequacy of notice is questionable) (collecting cases involving subsequent purchasers where record notice was in various ways imperfect or incomplete).

---

[2] Defendant also maintains that the .91 acres consisted of one legal parcel, not two.  In support, it points to a Spartanburg County Tax Map reflecting one parcel and argues that Jaylin, as the REA's Declarant, had the authority to combine Parcels 2 and 3 into a single parcel.  However, Defendant's argument here fails to persuade the Court.  As an initial matter, the REA itself describes the two parcels separately, by separate metes and bounds.  Moreover, the so-called Northpoint Plat given by Jaylin's representative to Mr. Sims and then to Mr. Querin specifies two separate parcels.  In view of all of the following, the Court does not find that a contrary tax map is a valid, controlling legal description.

Exhibit E is, in fact, a depiction of Parcels 1, 2, and 3, and is taken directly from a site plan presented to Ingles by Jaylin and thereafter approved by Ingles and attached to the amendment to the lease. It clearly shows that a building spanning more than one lot is not allowed. It also sets forth the maximum allowable square footage of each building and requires each building be in a specific location with a specific orientation. The Akkarys are charged with this knowledge.

This matter is reasonably similar to *RL REGI Financial, LLC v. DDB of Spartanburg, LLC*, 2012 WL 602886 (D.C.S. 2012). There, Regions Bank ("Regions") commissioned and received an appraisal on certain property prior to taking a mortgage on the property to secure a loan. The letter forwarding the appraisal, addressed to a Regions employee, indicated that there was "leased billboard space" on the property and described the property as a "leased fee estate." *Id.* at *3. In addition, the appraisal referenced the leased billboard space several times within the document. The leasehold interest was held by MCC Outdoor, LLC ("MCC"), and the question arose as to whether MCC's leasehold interest had priority over Regions' mortgage interest, as MCC contended Regions had notice of its leasehold interest. Interpreting and applying South Carolina, the Court concluded that Regions had constructive knowledge of the existence of the leasehold interest. *Id.* at *3. The Court found that the letter and appraisal were sufficient to inform Regions of facts which, had Regions made even the most cursory of inquiries, would have revealed MCC's leasehold interest. *Id.* A similar logic applies here.

Defendant argues that because Exhibit E was not attached to the recorded REA and because the Akkarys, through representatives, requested from Jaylin, broadly, the types of documents that would include Exhibit E, Defendants were not required to have investigated any further, upon failing to actually receive Exhibit E. However, as Exhibit E was specifically

11

referenced in the REA as the document setting forth the allowed locations of buildings and parking on the property being purchased, prudence dictated, at least, that the Akkarys make some targeted, specific inquiry concerning Exhibit E.

In *South Carolina Tax Commission v. Belk*, the South Carolina Supreme Court noted that the innocent purchase for value doctrine is not available "when sufficient record notice is available to charge the purchaser with a duty to inquire which, if pursued with due diligence would have supplied him with knowledge of the rights of other parties." 225 S.E.2d 177, 179 (1976). The Supreme Court went on to note that "when the exercise of prudence would have avoided the difficulty," one who fails to inquire does so at his own peril. *Id*. The Court surveyed a number of cases on the issue, noting that "a purchaser cannot carelessly disregard record notice of potential encumbrances, even when the adequacy of notice is questionable." *Id.* Rather, a purchaser has a duty to make "an independent investigation." *Id*.

In one case highlighted by the Supreme Court in *Belk*, a recorded mortgage referred to a prior but unrecorded timber deed. *See National Bank of Newberry v. Livingston*, 155 S.C. 264, 152 S.E. 410 (1930). The Court found that a subsequent purchaser's interest was subservient to the unrecorded deed, as the purchaser was on notice of the unrecorded deed because it was mentioned in the recorded mortgage. The recital in a document of record, in other words, constituted constructive notice to the purchaser of the unrecorded document.

A similar principle is properly applied here. There is no issue that the REA was correctly recorded, and that it was in fact reviewed by the Akkarys and their representative. Nor is there any question that the REA made four specific references to the unrecorded Exhibit E, as an attachment defining what could be built on Parcels 1, 2, and 3. Defendant was therefore on

12

constructive notice of the existence of Exhibit E prior to purchasing the property and is properly bound by its restrictions.

### B. APPLICATION OF FOUR FACTOR STANDARD FOR INJUNCTIVE RELIEF: IRREPARABLE HARM, NO ADEQUATE LEGAL REMEDY, BALANCE OF EQUITIES, PUBLIC INTEREST NOT DISSERVED

As to the four specific showings that plaintiffs seeking permanent injunctive relief must demonstrate and that reviewing Courts must find, the Court finds, firstly, that Plaintiffs will suffer irreparable harm in the event that Defendant is permitted to construct its building in violation of the REA, including in violation of the restrictions set forth in Exhibit E.  As presently designed, the proposed building will permanently obstruct the visibility of the Ingles store from adjacent roads, and, in particular, will obstruct the center view corridor.  These obstructions will irreparably damage Ingles by interfering with the visibility of its store, which is of paramount importance to Ingles when deciding to locate and site a grocery store.

James Lanning, president of Ingles, offered deposition testimony regarding the importance of the line of site of Ingles stores, and the restrictions Ingles takes pain to put in place to maintain the line of site, all of which relate to Ingles customer experience.  (ECF No. 56-9 at pp. 3-4).  He also testified that the loss of line of site would, in his opinion, result in a reduction in sales of approximately ten percent. *Id.* at pp. 7-8.  Lanning noted that the rear of the proposed building would face the front of the Ingles store, thereby decreasing the attractiveness of the store to its customers.  Moreover, pursuant to the terms of the lease, the development of Parcels 2 and 3 in a manner inconsistent with the REA could result in a default by Plaintiff Sky King and materially affect its rights with regard to the future development or sale of the shopping center. (ECF No. 56-13 at p. 2 and No. 56-14 at p. 2).

Interests in real property, including leasehold interests, are unique and their deprivation may therefore commonly result in irreparable harm. Recently, the South Carolina Court of Appeals cited to a discussion of the irreparable harm suffered by a lessee in a decision of the Federal Court of Appeals for the First Circuit:

> Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor. Then, too, harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages – and for that reason, more likely to be found "irreparable." … Beyond goodwill, the loss of revenues, resulting from consideration such as diminished visibility, restricted access, less commodious parking, and the like or sufficiently problematic as to defy precise dollar quantification.

*Kmart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (cited in *H.H. Hunt Corp. v. Town of Lexington*, 389 S.C. 623, 699 S.E.2d 699 (Ct. App. 2010)) (finding that a restriction on the use of a party's property makes it unlikely that money damages will provide an adequate remedy).

In *Kmart Corp.*, a case sharing factual similarities to the instant one, Kmart was a lessee in a shopping center. The lease agreement in place provided that the layout of the common areas, as depicted on an attached exhibit, could not be changed without Kmart's consent, and that no buildings or other structures could be erected, except as shown on that same exhibit. When the landlord moved to develop certain space in contravention of the provisions of the lease and against Kmart's wishes, Kmart sought a preliminary injunction.

Ultimately, the district court issued both preliminary and permanent injunctions, concluding that "Kmart [could not] recoup, even thru legal damages, the injury to its goodwill caused by the visual obstruction of its store." *Kmart Corp. v. Oriental Plaza, Inc.*, 694 F.Supp. 1010, 1016 (D.P.R. 1988). The *Kmart* Court went so far as to order the landlord to raze one of the structures and enjoined further construction except in compliance with the lease. Upon

14

review, the First Circuit affirmed, finding that the harm to Kmart "did not consist merely of lost sales (in themselves difficult to calculate and monetize), but also involved a detriment in 'presentation of the store to the public'." *Kmart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (reviewing and citing district court opinion).

Here, the Court likewise finds a remedy of monetary damages to be impractical. First, Defendant is a small business not able to respond in damages. Second, while Plaintiff Ingles tentatively calculates damages in sales at approximately $73,000.00 a year, the Court concludes that it is impossible to calculate the damage done to the shopping center should Ingles decide to vacate due to the loss of visibility, loss of brand, etc. As a result, any monetary remedy cannot adequately remedy the harm to Plaintiffs, and thus there is no adequate legal remedy. *Capital One Bank (USA, N.A.) v. Carefree Debt, Inc.*, 2010 WL 2228418 (D.S.C. 2010).

On the question of the overall balance of the equities, the Court next concludes that although Defendant will undoubtedly suffer some harm as a result of the Court's grant of the injunction sought by Plaintiffs, the Court nonetheless finds that said harm is not so substantial as to render the remedy of injunction unwarranted on these facts. To be sure, the injunction will make illegal Defendant's contemplated construction, as it violates both the one structure per parcel limitation set forth in Section 5.3 of the REA, as well as certain additional limitations set forth in Exhibit E. However, the injunction will not result in the total loss of use of the property, as these restrictions do not prohibit all construction. Defendant will remain free to construct buildings on the parcels, which the Akkarys purchased for $75,000.00, (ECF No. 56-8 at p. 3), so long as they do not run afoul of the restrictions contained in the REA.

The fact that the Akkarys have drawn down a portion of a construction loan does not meaningfully inform the Court's sense of the equities here, as they were on notice of the

restrictions in the REA before purchasing the property. Any monies expended were done so at their own risk. *See Buffington v. T.O.E. Enterprises*, 383 S.C. 388, 680 S.E.2d 289, 291-92 (2009). Additionally, the Court notes that the Akkarys continue as tenants in the shopping center, where they have operated businesses, uninterrupted, since 2001, and this injunction will not affect their rights with respect to the leases for their businesses in the center.

Finally, on the question of impact on the public interest, the Court concludes that the public interest will not be disserved by the grant of an injunction on these facts. Restrictive covenants are contracts, which courts are obliged to enforce. Here, Plaintiff Ingles took pains to bargain for long-range, contractual provisions that would assure that the sightlines to its grocery store would be protected, along with other interests in the lease and the shopping center. It will certainly not disserve the public interest for the Court to protect these bargained-for property interests, as recognized by South Carolina law.

## **CONCLUSION**

A decision whether to grant or deny an injunction sounds in equity and is addressed to the sound discretion of the Court. For all of the reasons set forth above, the Court finds that Plaintiffs have demonstrated by clear and convincing evidence that the Akkarys, and thus Defendant Maria, had actual notice of the contents of the REA. Moreover, Defendant had constructive notice of Exhibit E, which Plaintiffs have proven was intended to be attached to the REA. As such, Exhibit E is part and parcel of the REA, which sets forth restrictive covenants which run with the land. Additionally, Plaintiffs have proven by clear and convincing evidence that failure to enforce these restrictive covenants will result in irreparable harm to them. Finally, in balancing the equities, the Court finds that the harm to the Plaintiffs outweighs any harm to

Defendant, and that the public interest and the decisional law of South Carolina favor the granting of an injunction.

Accordingly, it is hereby **ORDERED** that Judgment enter in favor of Plaintiffs on its causes of action for injunctive relief and that Defendant is permanently enjoined from erecting any building or buildings on Parcels 2 and 3, except as in strict compliance with the contents of the REA, including Exhibit E.

**IT IS SO ORDERED.**

<u>s/Mary G. Lewis</u>
Mary Geiger Lewis
United States District Judge
District of South Carolina

Columbia, South Carolina
October 18, 2016